Columbia, et al., appellants. Ms. Anderson, for the appellants. Ms. DeHannan, for the appellate. Good morning, Your Honors. Stacey Anderson on behalf of Appellants Quincy Booth and Wanda Patton. With the Court's permission, I'd like to reserve two minutes for rebuttal. Your Honors, I think where I want to begin today is with the second prong of the qualified immunity analysis. The jurisdictional question and the merits on that point are clear-cut and straightforward. This Court plainly has jurisdiction to consider whether the law was clearly established at the time Ms. Johnson was removed from her position. In Johnson, the Court recognized its reviewable determination. It's a question of law, and it's one where the Court assumes in reviewing the question that the facts are taken in the light most favorable to Ms. Johnson. And the District is not disputing that that is the appropriate standard here. We review the facts in the light most favorable to Ms. Johnson. I think one of the things we have to decide is whether the April 27th interview, which I guess then aired in early May, was a but-for cause of the firing. That seems like a pretty fact-bound question. Yes, Your Honor. But again, on the clearly established prong, the Court assumes there was a constitutional violation. The Court would resolve that question. Right, which is why what's presented to us regarding the April 27th interview seems like it may not be the type of question we have jurisdiction to consider on an interlocutory appeal, because it is not raising any disputed questions of law. It's just raising a disputed question of fact. As to the disputed question of fact, Your Honor, I think there is an area where the Court has jurisdiction, and that's where the factual finding or the lack of a factual finding here would not be supported by the record, is blatantly contradicted by the record. So in the district's view, the record would blatantly contradict any finding that Patton knew about the April 27th interview. I thought that was exactly the part of it that Johnson v. Jones said is not subject to scrutiny. It is generally a question of law to be sure. We review summary judgment on final judgment all the time, and it's a legal question whether the record reflects a material issue of fact and dispute such that the nonmoving party, if it's the plaintiff, could persuade a fact finder. But Johnson v. Jones does something different in terms of... I don't dispute that, Your Honor. I think Scott versus... But it seems like you are fighting the record in terms of... Again, let me make clear, for purposes of whether the law was clearly established, we resolve that factual dispute in Ms. Johnson's favor. We will take that the court can assume that Patton knew about the interview. The question on the clearly established prong is whether assuming that constitutional violation exists, whether the law was clearly established that terminating Ms. Johnson in the circumstances of this case was unconstitutional. Now, am I understanding you right? You are assuming, for the sake of argument, that the April 27th interview was a but-for cause of Johnson's firing? For purposes of the second prong. I'm not conceding that point. If the court gets to the First Amendment question, I am not conceding that point. I would argue that, again, based on where facts are blatantly contradicted by the record, and in this case, it's our view, the court does have jurisdiction. It's a narrow, narrow exception. I recognize Johnson versus Jones. I understand that principle, but it is a narrow exception. If nothing had been written, said, or leaked other than the April 27th interview, would Johnson have been fired? If nothing else, I don't believe so, Your Honor. I think the Department is clear that her statements to the media had nothing to do with her termination. Okay. So, and I think the record supports you on that. I think, arguably, it would be a blatant misreading of the record to conclude otherwise. But that question of whether the record supports you on that is outcome determinative in my hypothetical, and we have to I'm asking you, is that a question of fact that we don't have jurisdiction on interlocutory appeal to consider? You have jurisdiction, Your Honor, again, because I believe it is blatantly contradicted by the record under Scott versus Harris. That's a very, very narrow exception. Yeah, but Scott versus Harris, you have a videotape and nothing to the contrary. We have nothing close to that here. I disagree, Your Honor. We only have two pieces of evidence in the record regarding Patton's knowledge. One is her statement that she knew nothing about the And the second is an email received the day after the interview, April 28th, that said, Ms. Johnson's going to be interviewed at some point in the future. No rational trier of fact can find from that that that gave Patton notice that Johnson had been interviewed the day before. No, but the termination takes place sometime after that. There's a hearing officer who says termination is not appropriate here. All the facts, including the email facts, only support lesser reprimand or some kind of discipline. And the decision makers here pushed for further consideration. And so that's part of what the district court is taking into account, is that there's a kind of a re-decision on discharge. And there's no dispute that that's with knowledge of the interview. No, I believe that they didn't learn about her participation in the interview until this litigation, Your Honor. So that is disputed. But I do want to talk about the hearing examiner's recommendation for just a moment. I give that very, very little weight. And I think the court should give it very little weight because she did not understand the Whistleblower Protection Act. She suggested, she believed that Ms. Johnson was a whistleblower. And yet she recommended that Ms. Johnson be reprimanded or suspended. That is illegal under our Whistleblower Protection Act. If, in fact, Ms. Johnson was a whistleblower, we could take no retaliatory action against her. We could take no adverse employment action. That hearing examiner fundamentally misunderstood our Whistleblower Protection Act. So that recommendation was just based on a misunderstanding of the law. But again, if I could just briefly get back to my point on the second prong, whether the law was clearly established. The court does not need to look at the facts in this case on a granular level to look at that. I think there are only really two main facts that warrant consideration on the second prong. And that's the fact that Ms. Johnson was a correctional or law enforcement officer. And that fact's important because in the analysis, the government gets a little bit more deference in that context. And the second fact is that she disclosed confidential information. Those two facts alone, looking for clearly established law, just taking those facts, Ms. Johnson hasn't identified a single case where a court in this country has found a First Amendment violation with respect to a law enforcement officer who has disclosed confidential information. There is not clearly established law that would suggest that it's a First Amendment violation to terminate her in those circumstances. In contrast, the district has identified authority from this court, Bauman and Brigham, where the court found those First Amendment violations where law enforcement officers disclosed confidential information. And the district has cited cases from other jurisdictions where there's been no First Amendment violation. There is no decision out there that would have put Booth and Patton on notice in this case that in firing Johnson as a correctional officer who disclosed confidential information would violate the Constitution. I think the court can render that decision and that would be dispositive here. Do you know how other HIPAA violations have been handled by the Department of Corrections? I don't know that there have been others. I know in this case, there was, I think, one email disclosed by the union president that may have contained information. I don't think the DOC was aware of that at the time. They haven't taken any corrective action since. But the point here, I think... Is the union president a DOC employee? He is. But the point I want to make, Your Honor, is even if he were offered up as a comparator, which Ms. Johnson has not done, the degree of her egregious violations of the HIPAA statute, I think, make her not comparable to him. And Patton was very clear that in her over 20 years in the DOC, she had never seen such an egregious violation of the district's confidentiality provisions. But this is unlike Bauman in the sense that in Bauman, there was an investigation going on into... I think it was a hostage-taking situation. It was quite a serious situation that was separate from any investigation into Bauman's conduct. And there, we also held that it was only for the period of time that it would have been serious, that it was serious to disclose the recording. And here, we don't have any actual investigation that suffered from Johnson's disclosure. And I don't think the district had to show an investigation. I think the Supreme Court was clear in conduct, and this court was clear in Lafonde, that we only have to have a basis to believe that there may have been some impairment of the investigation. And we did at the time. I mean, you look at the time frame, that incident notification email went out at 8.45 in the morning. 30 minutes later, it was sent to the union attorney, and then that afternoon, sent to a reporter. That day is when DOC began its investigation of the leak. That's when we learned about that, right? And so in that time frame, we had every reasonable basis to believe that there may be an investigation happen in the future. This was a fresh new incident. It was just unfolding. And also, again, not to call into disputes of the factual record, but I would say, as I've argued in the brief, that on the face of that notice, there was going to be additional investigation. Videotape was sent over to a major to review, and the inmates were being referred for disciplinary proceedings. So again, I do take some issue with the notion that the record would support that. But putting that aside, we are not required to show we took an investigation, and I think that's clear. Well, I'm just talking about your analogizing it to Baumann, and it seems like that was what the court found to be really crucially important in terms of the balance on the employer's side, the weightiness of the interest on the employer's side. And here, we don't have any examples of going after people for this kind of disclosure. I also, you know, and I can ask Mr. Hannum, but Johnson herself didn't publicly disclose the... I disagree, Your Honor. She disclosed it to Hannum, and Hannum had no right to have that information either. Well, if she is in her role as a union leader conferring with counsel to figure out what, you know, what the recourse is for the people she represents... He does not have a right to confidential DOC information, Your Honor. There's no exception for the union's attorney to have access to this information. And again, I'm... Where's the clearest place that I can find a policy about that? So, I mean, there's several policies that deal with it. None says the union attorney doesn't get the information. There's just no exception there. So, we've got the confidentiality agreement that she signed in November 2015, which again lists several categories, including incident reports as things that are to remain confidential. We have the FOIA policy. We have the email... There's also under the Whistleblower Act, there's a safe harbor... Oh, sure. Absolutely, Your Honor. ...situation like this. And we're not disputing that, but she didn't follow the procedures under that safe harbor provision. Again, remember, that safe harbor provision deals with disclosures to your own personal attorney for purposes of determining how to disclose the information. The Hannum group was not Ms. Johnson's personal attorney. It was... Her attorney in the role that she was playing, which was independent of... They did not represent her. They represented the union. And again... She was also representing the union. But in addition to that, Your Honor, there are limited bodies that you can disclose that information to. Wait, was she a union representative? You're not answering my colleague's question. Yes, she was absolutely. She was a union leader. She was the executive secretary of the union. But I'm saying that the union did not represent her in her individual personal capacity. No, but she was acting as a union leader in speaking out on behalf... Yes, but as a... ...employees of the Department of Corrections and... And I don't dispute that, Your Honor, but that did not give her license to disclose confidential... Are you counting her as a management person? I'm sorry? Are you counting her as a management person? She was a sergeant. She was in a leadership position. Oh, you mean within the union? She... Yes, I would... No, in terms of confidentiality rules. I'm counting her as a management person who was bound by confidentiality rules. I'm counting her as a DOC employee who was bound by confidentiality rules. All DOC employees are subject to these provisions. But, yes, she was in the leadership role. She was a sergeant lead correctional officer and had been so for some time, which, again, makes, I think, her conduct so much more egregious because she should have been aware of the DOC's policies on confidentiality and had a role of advising junior staff members about that. But let me ask you, Ms. Anderson, if the evidence shows that there was a viewpoint-based retaliatory effort to punish Ms. Johnson because she was embarrassing the Bureau, the Department, where does that figure into the analysis? Does it have any role in balancing? When you're looking at employer interest and if the employer says, we have a really strong interest in HIPAA privacy, we have a really strong interest in non-disclosure of the identities of Department employees in this, for example, in the use of force, email, problematic. But if the reason that the employer is actually asserting its prerogatives in that situation is because it really is embarrassed and it's really angry at an employee, and I'm not saying that's these facts, but I'm just trying to understand where, does that downgrade the substantiality, the heft of the employer's interest at balancing or does it only come in when we're talking about, you know, factor and? Right, I think it comes in at the third step, Your Honor. Yeah, I think when you're looking at the second step, the Supreme Court's been clear that the two things you're looking at are Ms. Johnson's interest in speaking to the public and the public's interest in hearing what she has to say, and then the government's interest in keeping the information confidential or taking corrective actions for the disclosure of that information. It's at step three where you get to the, what was the motivating factor in this case, and if you get past step three, there is some animus, you know, there's been a determination that it was motivated at least in part by some improper animus, and that was what brings you to step four, and at step four, what we look at is would the employer have taken the same action anyway, and the district court, I think, found in this case that there was evidence, the district carried its burden to show by a preponderance of the evidence that we would have taken the same action anyway, where the district court misstepped was at the pretext stage where it didn't apply that but-for standard of causation, merely found that animus could be a partial motivating factor in the case, and when you look at how, you know, how do you show the but-for prong, how does Ms. Johnson demonstrate that our real motivation was an improper reason? There's usually two ways you do that. You do that by showing that the reason given for the termination was illegitimate or false, and I don't think there's any dispute here about that, and the district court found that we had a legitimate basis for disciplining her, and then the second way you do it is by showing usually similarly situated comparators were treated differently, and Ms. Johnson's not offered up a similarly situated comparator that was treated differently, nor she pointed to any other evidence in the record that would suggest the district's explanation here was pretextual, and I see that I've really eaten into my rebuttal time. No, no, I mean, as long as we're interested in asking questions, we don't hold it against you if you go over the time, so just circling back to make sure that I have your answer clear. If there is an asserted employee interest in speaking publicly on matters of public concern, and we look at the context and what the person says and how it relates to what's going on in the world, and we say, okay, public concern, and the employer has policies on the books that it never actually enforces. People violate them day in, day out. Again, not this case. I'm just trying to get clear on the legal principle, and they, but they say these are really important policies of ours. The person violates, and they say this is a violation. The employee says, yeah, I did actually technically violate that policy, but you're after me because you disagree with what I said, and so when you say that's your interest, it's actually not your interest. There's no role for that in that balancing inquiry. I don't think so, Sharon. It's our interest in the information. I think that's an issue there, and the impact of its disclosure on our governmental operations, so disclosing, you know, the names of employees. So the interest isn't really tied to the policy or not. It's just looking at sort of facts in the real world. No, I think it's tied. I mean, the policy exists because of the district's interest in those goals. So you're sort of balancing. Well, you look at more function. Again, I think so, and I think, again, to the extent that there's some improper motivation, that's taken into account at the third step of the Pickering test. I mean, we know no need for the third step if it was baked into the second already, and so I do disagree that that's the proper formulation of the analysis. What is it in your confidentiality rules, if I can understand better, that says a person who was a union official but has management responsibilities is prohibited from sharing information that that person properly has in hand with other union persons? Again, Your Honor, the confidentiality provisions are also in the collective bargaining agreement, which binds all union members, including union management, not to disclose information that the Department of Corrections designates as confidential or deems to be confidential. So that's a wholesale- Not to disclose. You're missing my question. Not to disclose. Obviously, there's disclosure because she got the information to be able to disclose it, and she was involved with a committee of union people, right? Correct. And everyone knew that was part of her official responsibilities in the operation. Correct. What is it in the in that kind of a situation, you, a union official, who properly have this information in hand, cannot share it with other union officials? It's not that she shared it with other union officials. It's that she shared it with a union attorney who is not an employee of the Department of Corrections. That's a simple question. I'm trying to figure out where it is you think she stepped away from the confidentiality. She had a right to be able to share it otherwise. She could share it with all the members of the union management team who were all Department of Corrections employees and who would have independently had access to the information. It's that it went to the union. But it didn't only just go to the union. If you look at Ms. Johnson's declaration, she knew when she gave it to the union that it was going farther than that, that it was going to be used in litigation and disclosed publicly. And it was, in fact, her emails were attached, unredacted. I understand. I guess I'm trying to understand the reach of the confidentiality. Certainly. Anything outside the Department of Corrections or a Department of Corrections employee, Your Honor. And the case would have been a different case if she had... It wouldn't have been a different case in your view if she gave it to counsel and just said, of course, if this is going any further, you have to redact the names. No, I think the counsel wasn't entitled to it. I draw the line at anybody who's not a DOC employee without prior authorization. So it went to counsel and counsel never disclosed it to anyone. Same result? I believe so. Yes. It's outside of DOC. And outside of DOC's control at that point. And we see what happens here. We have no control over the union attorney. He disclosed it to a reporter. He sent it to Meeking and litigation and attached it to the union's own litigation. So yes. And that's the very reason why we want to retain control of that information. So if Booth and Patton were looking at our circuit precedent at the time that they acted in this case to decide whether they could fire Johnson just based on her emails, what would be the best case? I mean, I think Bauman and Breiterman are the two cases. I think Breiterman is more helpful to our position. But those are the two cases in this circuit. But again, when we're looking at clearly established law, we're looking for law that says it's unconstitutional in these circumstances to take this course of action. And it's Ms. Johnson's burden. It's not the district's burden. Or I'm sorry, I'm representing individuals here. It's not my client's burden to identify cases that support what they did. Right. I understand. I just wanted to know your position on the law that you're relying on. But yes, Breiterman and Fowler would be the two circuits. And then I've cited a few other decisions from other circuits. Again, as I say, I'm unaware of any case where a court has found firing an officer for disclosing confidential information in the course of speaking as a And with that, Your Honor, if there are no further questions, I would hopefully have a couple minutes for rebuttal. Thank you. Mr. Hannon. Good morning, Your Honor. And may it please the court. This is clearly a factually intensive and densely factually intensive case, but the outcome is very logical and understandable. Let me talk first about a point that Your Honor made, Judge Millard. That is, things sort of started over again when we got to the first hearing and hearing examiner's decision on June 30th. The process administratively is that the proposal for removal goes to a hearing officer who receives written and personal presentation from Ms. Johnson. At the conclusion of that, this attorney wrote an opinion saying that two things, two important things. That Ms. Johnson's disclosures were permissible under the District of Columbia Whistleblower Act. And secondly, that her firing was retaliatory. Now, imagine these facts going to a jury, which on the status of the case now, they will. Where does that come from? That comes from the confidentiality agreement that the government relies upon that Ms. Johnson signed at the beginning of her 30-year career. And at the end of that confidentiality agreement, it says quite expressly, these restrictions do not apply to the District of Columbia Whistleblower Statute. You are free to do so. The other thing... Why did the hearing board say that Johnson could be punished? I missed the question, Your Honor. Why did the hearing board say that Johnson could be punished? That is, the hearing examiner? So, in the first instance, she suggested that there might be some minor punishment. That seems an odd suggestion, if Johnson did nothing wrong, and if, as you just said, the hearing examiner concluded that Johnson did nothing wrong. Well, Your Honor, let me pose the following to try to explain the reasoning of the hearing examiner. After that process, Mr. Booth had his people write a remand order, which Judge Contreras found to be highly irregular, and he has cited cases saying that if the government... I think the question was prompted by Ms. Anderson's point that if there's a carve-out, if there's a safe harbor under the Whistleblower Act, I mean, it may have been an irrelevant error because the hearing officer isn't imposing an alternative sanction, but the hearing officer said what seems to be erroneous, that if there's a safe harbor, then no discipline would be imposed. And so, I guess the question is, how do you address what... Does that suggest that the hearing officer was otherwise off track or somehow misunderstanding the nature of the safe harbor? What the hearing officer did and what Mr. Booth did with respect to the hearing officer is crisp to the middle of what the jury is going to hear. If the government can explain why the hearing officer did that, they can try to do that before the jury. But the important issue that I was trying to reach... I'm getting from your answer that you cannot explain why the hearing officer would suggest discipline while finding that Ms. Johnson did nothing wrong. And if you can't explain why the hearing officer would do that, it strikes me that the hearing officer's determination is pretty inexplicable. Well, I don't think it's inexplicable given the fact that the Whistleblower Protection Act allows everything that was done here. The issue of penalty, I can't explain why she did that except perhaps she wishes... I'm sorry. No, you can finish your She wishes as a government employee for the District of Columbia to try to give something back to the government. And let's look to what she did the second time, which is really, I think, important to answer your point. Booth did his reband. He gave her soup to nuts about HIPAA and everything else. And her next decision was, well, and this goes to Judge Mr. Hannon. Mr. Hannon represents the union. He didn't represent her. So here giving it to me was a violation. And then my passing it on to the press, she's responsible for that because I represent her. That's the gist of the second decision by the hearing officer. Let me change tack a little bit. Do you know of any case in this circuit or Supreme Court where the court found a First Amendment violation after a law enforcement officer disclosed confidential information? On that description, I can't think of one. And same answer if we expand beyond this circuit? I can't think of one. You have one in mind, apparently. No, I was wondering if you did. Let me ask a separate question. In how do you show causation or how should the court think about causation at step four of the Pickering analysis? Well, Ms. Anderson asked you to impose a but-for standard. And it doesn't appear anywhere in case law. It doesn't appear anywhere in jury instructions that are found in the various different circuits. But in any event, I would commend to the court a 2020 decision of Justice Gorsuch in Bostock versus Clayton City, Georgia. It was in a little bit of a different context. A little bit? It was a discrimination case, but it talked about but-for and what does but-for mean. And the argument that Ms. Anderson is making here is that if the standard is but-for, but-for means solely. So Ms. Anderson would want the judge to have to decide the fourth factor and inevitably the jury by requiring Ms. Johnson to counter the government's argument that they would have fired her in any event, which they have to meet by preponderance of the evidence. But at that point, Ms. Johnson must prove, oh, no, it was only solely because of my speech. And that standard doesn't appear anywhere in the law. It increases the standard that is imposed under the third factor. And it also is not what we think it is. I take her standard to be a little bit different, not too far from what you said, but a little bit different. I take her standard and by that I mean Ms. Anderson's proposed standard to be there's no causation unless the government would have fired the employee absent the sorry, after absent the unprotected conduct. Protected. Right. Sorry. Would have fired the employee absent the protected conduct. And at that stage, Ms. Johnson has to show it was pretextual. And that then to show whether it's pretextual or not requires that either the purportedly legitimate reason be a not legitimate reason or that there's a similarly situated comparator who was treated differently. Well, there were no others that were treated the same way that she was. And were there any similarly situated comparators who were treated differently than her? There's no way to know. So, have you identified any similarly situated comparators treated differently than her? There's no way. They acknowledge they haven't disciplined anyone. And that goes to our side of the fulcrum here. But my, so then my artful articulation of the test, but as Judge Pillard artfully corrected, that is the correct test, correct? Which is the correct test? The way that Judge Pillard helped me articulate the test for causation, that is the correct standard. That they have a preponderance standard to prove they would have done it anyway. And if they meet that standard, the jury, this is jury question. The jury is told if they meet that standard, then she needs to rebut it by the same standard of evidence. It's not, it's not but for. Did the Department of Corrections retain any people who gave press conferences or interviews around this time criticizing the Department of Corrections handling of COVID? Retain? Yes. They haven't, they didn't discipline any others. Let me, let me ask you a, so, so there are two different buckets of, of speech that are in play. One is emails, including the use of force email, and the other is the media interview. And I take the government, and they can correct me on rebuttal if they want, but I take the government to agree that the interviews were protected expression in Ms. Johnson's personal capacity and their dispute with you is over whether the interviews played a sufficient role or any role in Johnson's firing. But for you, based on the evidence in the record and inferences favorable to your client, could a reasonable fact finder conclude that the media interviews alone caused her firing? That the media interview. April 27th? Yeah, alone caused the firing. No, not on this record because. Your case depends on a ruling that Johnson had a First Amendment right to forward the emails? No, I think that's, I think that's a little bit of a different issue. In this case, my question to you, how are the two related? Are they related? So she forwarded work emails in violation of bureau policy. That was a stated cause for the firing. Do you have to, in order to prevail, do you have to show that she had a First Amendment right to forward those emails? Or can you say, well, whatever happens with the emails, independently, we have a First Amendment claim based on the interviews and their reaction to the interview. My position, Your Honor, is that the forwarding of the email to her attorney is not a violation of anything because under her confidentiality agreement, she's specifically authorized to blow the whistle. So there's no violation of any policy to begin with. And as Judge Contreras noted, if they felt serious about this issue of confidentiality, it would be marked. If they felt serious about HIPAA, the HIPAA warnings would have been included in all of these issues as well. If you're going to talk about the evidence in the light most favorable to Ms. Johnson, what I would say about Judge Contreras, he's a very balanced judge. He does not call somebody's argument unreasonable or specious or imaginary, but he does rule. And go ahead, you can finish your sentence. So if you look at that evidence in the light most favorable to Ms. Johnson, what I see is what the Supreme Court has talked about as an imagined government interest to try to squash her First Amendment rights or a specious government interest. Barron's versus Pelletier talks about that. When we're talking about qualified immunity, we have two things to balance here. On the one hand, we don't want to subject a government official to a trial where they might have immunity. And on the other hand, and the cases make this clear, we don't want the government to be posing specious and imagined government interests when somebody is exercising a First Amendment right, as is clearly the case at this point. And so if we were going to treat everything in the light most favorable to Ms. Johnson, what we would say is they targeted her. They swiftly went after her. They honed all of the rules and regulations to see if they could find some that she violated. They then created a notice of removal, finding her to have violated fictitious confidentiality rules. Now, Judge Comparis doesn't call it that. You conflating the confidentiality. Do you assume that there can be no valid confidentiality rules pursuant to which an employee, a management person knows? I can't talk about. Oh, no, I agree with that entirely. There are confidentiality rules. You're lumping them all together. Well, if you release the information pursuant to the D.C. Is there a process you follow if you're going to be pursuing the whistleblower act? Was that process followed here? No, sir. Imposing an internal administrative process before someone becomes a whistleblower is not part of the fulcrum and HIPAA, by the way, not part of the fulcrum, not part of the process within the administration. A whistleblower doesn't go to the supervisor and say, I'm going to send this information to our lawyers because people are dying in the jail. So there are rules of confidentiality. Right. If you want to know on the facts of this case, whether there are any rules of confidentiality that relate to the use of force email, for example, the answer is no, because it wasn't marked confidentially. Were any of the documents. Did the policy require that it be marked? Yes, it does. It required that it be marked to be covered. Absolutely. Do you have a J.A. site for that? Absolutely. And is there a J.A. site for that? Do I have a citation for that? In the appendix where we can see the policy requiring that. It's yes, it's under the rules of the Department of Corrections. And I can't cite the point in the appendix, but they talk specifically about having to mark items confidential that are confidential outside of HIPAA. And then they have very specific regulations requiring marking HIPAA. And they found her to have violated HIPAA, yet they don't recognize, and it's a administrative regulation. An administrative regulation permits Ms. Johnson to provide the information to me very specifically. To provide? To provide the information to an attorney. Personal attorney? To an attorney that represents, I can't remember the language, but it represents her or a colleague or somebody of interest with her. But that doesn't mean there's no confidentiality rule in place. Even though she can talk with an attorney, there can still be a confidentiality rule which says with respect to this kind of information, and you may think you're going to be in trouble, so you want to talk to your attorney, you can. But you can't go out and share it. That's against the rules of this operation, this government operation. That's their claim. You seem to be saying there's no such thing as a confidentiality rule here. No, Judge. I'm not understanding. I'm not. If it's legitimate, let's assume it's legitimately marked as a HIPAA confidential document. You can have a confidentiality rule. It's not HIPAA. I'm not going to go into that. The question in this case is, was there a confidentiality rule that was breached? Did the district court say there was none? It cited that as an interest of the District of Columbia to be balanced against her First Amendment right. And it discussed basically the two prongs of their interest, one with respect to the use of force email. They said that the use of force email is confidential because it's a pre-investigatory document. And he said that he dispensed with that because there was no investigation conducted at all. Then the other part is the medical side of things, the HIPAA side of things. And I'm not making myself clear, but let me try again. Let's take the generic Department of Corrections confidentiality requirement on medical information. And let's assume it's marked. So if it's marked and it has to do with medical information for an inmate, then it would be a violation to disclose it unless you're doing so under the DC whistleblower statute, which in her confidentiality agreement expressly permits her to do that. And the HIPAA regulation, which is in the CFR and it's cited in our papers, that regulation similarly makes it clear that someone in a workplace can provide information about the potential death of inmates and correctional guards to an attorney, which is what was done in this case. Now, the District of Columbia tries to have it both ways. At one point, they try to say, I'm not her lawyer and HIPAA doesn't apply. And then in the next instance, they say, well, I am her lawyer. So the disclosure to the press is my problem. Those aren't necessarily in conflict because they're saying you're not her lawyer for purposes of you being effectively her for purposes of obtaining this confidential information, but you are a conduit of hers. It doesn't matter whether you're her lawyer or not, that you're someone that she. And I mean, I'm actually, I assume you've talked to your client about this, but it seems like you have a conflict in this appeal potentially because there are aspects that you're actually involved in that could have shielded her in arguments that haven't been raised. Well, I appreciate that. And the point I think that needs to be made with respect to that is that there's no question that Ms. Johnson had no idea that I was going to send this to the press. No question about it. Is that in the record? Is there a declaration from you in the record? It is in the record. It is in the record? I don't have it at my fingertips, but there's no dispute about the fact that I believe it's in the hearing officer's report. There's no dispute about it that she didn't know. And the hearing officer in the second decision held her responsible for that because she was under the rules of professional responsibility going to assume that since her lawyer did it, she did it. I don't understand how we can consider that fact as a fact on the record if you can't identify where it is in the record. It's not like we can take advantage of the unusual situation where the fact witness is also her appellate lawyer and then find some facts here in the appellate argument. It's certainly in everything that we wrote and presented to the hearing officer. My recollection is she wrote that in her decision, which is at 366, I think, in the appendix. And Ms. Anderson can dispute me, but I don't believe that her side. I think in her brief, she actually indicated that. Ms. Johnson sent you the use of force email and the emails with the HIPAA information, correct? Repeat that. Ms. Johnson sent you the use of force email? Correct. And the emails with the HIPAA information, correct? Yes, or myself or my partner. If the First Amendment does not prohibit the government from firing Ms. Johnson for doing that, do you lose your First Amendment claims in this case? That's an interesting question. And, of course, it assumes the outcome. And in addressing that, what I'd like to point out is that the government, in its opposition to our motion to dismiss it in their cross-motion for summary affirmance, they say that... They agree with you. I read their motions. But I'm asking, I know you don't agree with the motion, but I'm asking, that the First Amendment does not prohibit the government from firing Ms. Johnson. I know you don't agree with that premise, but if you can assume that premise, do you lose your First Amendment claims in this case? I got it. So here's the issue for the court, in my view. Even though the opening brief for the government relied on factual disputes, right? And they've now changed their position. They're telling you, oh, no, it can't be a factual dispute. So here's what the position I believe is for this court, and why this court should not exercise jurisdiction. The argument being made here is that when the trial judge does the balancing and comes out in favor of there being a First Amendment violation, looking at both sides of the case, because there's a qualified immunity claim in there, those who didn't receive qualified immunity, for whom it was denied, because of the factual determination under the First Amendment prong, if it goes to the Court of Appeals and you disagree, not only is the qualified immunity decision wrong, but the First Amendment claim has to be dismissed as well. So that's where you're headed, I believe. And in my view, that violates the final order rule, allowing qualified immunity, which can come to the court on very limited circumstances, where there's no dispute as to the fact, to then carry the day with respect to a decision against the government. They lost on summary judgment on their First Amendment. I think I have your answer. And I think it's that even if sharing the emails with you was unprotected conduct, conduct unprotected by the First Amendment, you can still win on your First Amendment claims because... If it's unprotected conduct. If the email forwarding was unprotected conduct. Under the First Amendment. I think this is related to a question I asked earlier, and you can correct me if I'm wrong, but that I don't think you answered, which is, if the provision of the emails is not protected, in other words, we've heard your safe harbor arguments, we're just trying to understand how the different pieces of the case really fit together. If we were to hold that either the defendants are qualifiedly immune on the emails, or that the record doesn't support Johnson's claim on the emails, is there a separate claim, First Amendment claim based on the interviews? And if so, how do you respond to Ms. Anderson's argument that there's no record evidence that the decision makers were ever even aware of those interviews when they made the decision and reaffirmed the decision to fire Ms. Johnson? You need to focus on the April 27th interview. And the only evidence on the government side was Ms. Patton's declaration, which was prepared by counsel and Judge Contreras examined that very, very carefully. And he concluded that her declaration wasn't sufficient to demonstrate that she or anyone had made the decision to remove Ms. Johnson before April 27th. And he cited to the subsequent conduct, the presentation of the information to the human resources folks, the creation of the report by the lawyers, coming back to Ms. Patton and her signing a notice. Now, part of that I hesitate to point out is that when Ms. Patton signed that notice, it was just a notice. She did not express any opinion whatsoever about whether she should be removed or not, or had done so at any other time. So what I think you would have to do, Your Honor, is you would have to reject the evidentiary finding that Judge Contreras made with respect to that. On its face, he says it doesn't say that. And in the light of subsequent conduct, it doesn't say that. And he doesn't say this is pretextual or doesn't say this is something a lawyer did. What he says is that the jury can either conclude that they had made a decision before, or they could conclude in her favor they hadn't made a decision before. I also want to comment here on that case law. Ms. Anderson says that the case law says if a removal is, quote, contemplated before the actual protected conduct. I think the more challenging record question for you is she's asserted that there is no evidence in the record that the decision makers were aware at any time, even before the remand to the hearing officer of the May 1st publication of the interview results of the interview that she gave on April 27th. And what is your response on that? The only evidence, as Ms. Anderson has indicated, is the declaration of Ms. Patton. So you don't have to have affirmative evidence on which a jury could depend. If I'm the fact finder and I'm trying to decide, okay, maybe I disbelieve that declaration, but what am I depending on other than speculation that these decision makers learned of? No, it wasn't statements. It wasn't speculation. I want you to tell me why not. Because the trial judge, Judge Contreras, looked at the facts of the case. He said, first, her declaration doesn't say what counsel says it says. And the second focus they took was the subsequent activities of what transpired before the notice was actually sent, indicating that there's no way to know when it was contemplated that she's going to be fired. But I don't think that the case law that the government describes with respect to this contemplation, that if you contemplate something before you know of the protected, I don't think that... Just put that aside. Yes, sir. Mr. Hand, I'm at JA 519. It's paragraph 33. This is Ms. Patton. I have never seen footage of any interview Sergeant Johnson participated in and have no knowledge of whether it took place, what statement Sergeant Johnson made, or when, if ever, it was published. What in the record contradicts that? Isn't it the April 28th? There's a... Maybe it was you, attorney for the union, notifying the department that Johnson was going to give this interview? Yes. You haven't mentioned that. Sorry? You have not mentioned that in response to our questions. Yes, it was... She's going to be talking to the press about this crisis in the prisons, in the jail. Yes. That would be one way that they know, that she's given an interview. Well, I don't think the issue is what you posed, respectfully, because I think the issue is whether she contemplated before April 27th. I know that's the issue for you, and I will give that thought and reflect on whether that should be the issue. A different issue that I'm trying to figure out the answer to right now is, in light of this statement that I read, that Sergeant Johnson had no knowledge of whether any interview took place, no knowledge of what statements were made. Is there anything in the record that contradicts that? I understand that the April 20th email put Ms. Patton on notice that there would be an interview, but that email did not say what statements Sergeant Johnson made, or even if the interview ended up taking place. Has it happened? Did it take place the day before? Mm-hmm. I think that April 28th email does not contradict this Paragraph 33 statement. Is there anything else in the record that you think contradicts this Paragraph 33 statement by Ms. Patton? Judge Walker, Judge Contreras, based on those portions of her declaration, found that certain of the disclosures that were part of Count 1, the D.C. Wilson Borough complaint, could not be proven. So he did take that into consideration. My point is that it's not relevant to the First Amendment balancing, because that had to do with the argument that the government's making that because there was a contemplation of removal before the interview, that they're protected. So, yes, Judge Contreras took note of that by striking some of the disclosures that underlie the D.C. Wilson Borough statute claim. And how does any of that contradict Sergeant Johnson's statement that she has no knowledge of what statements Sergeant Johnson made in the interview? I don't know what interview that's referring to. The April 27th interview that aired on USA 9 on, I think, May 1st. I don't think that modifies my answer, because if that was relevant to the anticipated removal or contemplated removal argument, then Judge Contreras would have commented upon that. I will say, I think you're giving the best answers that the record probably allow you to give, so I don't fault you for the answers. If I, I don't know who will write, I don't know how we will decide this case. I don't know who will write it. But if I were to write in this case, here's what I would say. I would say counsel for Ms. Johnson was unable to identify anything in the record showing that Sergeant Johnson had ever seen what statements, sorry, that Patton had ever seen what statements Sergeant Johnson made in the WUSA 9 interview conducted on April 27th. Would that be a fair statement in my opinion? Forgive me. Because it's not relevant to the First Amendment. Okay, I think we have your answer. Because that doesn't, that doesn't make a difference. If she contemplated removing her before the 28th, and all this other events took place, that's not going to, you know, carry the day as far as the law is concerned, because Judge Contreras made factual determinations that her declaration about when she contemplated removing doesn't prove that. That removes her defense. It doesn't make your case. I mean, Judge Contreras does say that the emails are not everything. Johnson expressed her dissatisfaction with the Department of Corrections response to COVID in other ways that have nothing to do with the emails, including her late April interview with a local news station. So he does rely on that. And I suppose we have to go back and come through and see where he connects the dots that they were aware of that. It, forgive me, but it doesn't make a difference on the First Amendment analysis with respect to the legal argument of a previous decision to fire her before. Previous decision to fire her, we're putting that aside. Imagine we are convinced by your argument that there was no previous decision, that the decision, or that even if there were, they remade the decision later, right? When they said to the hearing officer, no, you can't reverse the termination. You should support the termination. That all happened afterwards. So put aside their effort to say, oh, everything we decided was before April 27. Just put that aside and assume that's not in the case. Then the question is, well, still, do we have evidence on which a fact finder could say, ah, but by the time they later made the decision and carried it through to fruition, they did know about more than the emails. They knew the interview she gave in late April to the local news station. And in fact, it's fair to say that was a motivating factor in the decision, and they wouldn't have made it but for. And I'm supposed to ignore the June 30th decision, the hearing officer that was. Did the hearing, did anybody tell the hearing officer about that interview? The hearing officer had the proposal for removal and they had our response to the proposal for removal, I don't think depended on that. What I'm talking about did not explicitly depend on that. What I'm talking about is what I'm talking about is what your honor referred to as sort of the clock starting over again after the hearing officer's first decision finding in favor of Miss Johnson and that pursuing the removal after the hearing officer's first decision was was intentional misconduct by the government in violation of her First Amendment rights. That's good. Thank you for your anything else. All right. Thank you. Thank you. I think hopefully two brief points, your honor going to the question of the April 1st and April 27th interviews. I just want to be clear as to Booth, who is the final decision maker in the case. The district court found no evidence that he knew of either of the two interviews. As to the April 1st interview, the court also found that Patton knew nothing about it. The only interview that's at issue here is the April 27th interview, whether Patton knew about it and what role she played in the decision making process. The other point I wanted to make just going back to the district court, I think you correctly stated the standard under Johnson versus Jones that if there's if the district court is saying the record supports, you know, read in the light most favorable to the plaintiff, the evidence of record supports that Patton was aware of the WSA-9 interview and a reasonable jury could find that that was a motivating factor, that that's not something that's before us. I disagree. Johnson versus Jones. Under Scott versus Harris, I believe it is. Other circuits have recognized that very, again, very narrow exception. It has to be blatantly contradicted by the record. And there could be no evidence. So blatantly contradicted in two ways. There's only two pieces of evidence in this record. Patton's statement, she didn't know about it. And that April 28th email that didn't reference the April 27th interview and only suggested that Johnson was going to give an interview at some point in the future. That cannot establish that Patton had actual knowledge of the April 27th interview. It seems like pretty fair circumstantial evidence that they're in the they're in this grappling with her. She's she's blowing the whistle. She's sending out email information saying, look, it's a crisis in there. They're not doing COVID. And, you know, she's the she's the poster child for objecting to the to the policies on COVID protection of employees and inmates in the jail at this time. They're not going to, like, learn something that's been publicly. What's the evidence in the record? Your Honor, it's speculative. No, the evidence in the record is that it's completely publicly available and that they knew it was happening. That's so it's circumstantial evidence. I don't know that you're saying that the record blatantly. Yes, and in our view, it does. OK, yes, I stand firm by that, Your Honor. And then I just want to go back to the hearing examiner's initial determination regarding the 22 emails that it found. She found to be protected by the whistleblower Protection Act. As the court knows, there's a whistleblower claim in this case of those 22 emails in this case, in her whistleblower claim, Johnson only argues that one of those 22 emails were protected by the whistleblower Protection Act. I think that's very telling in terms of the accuracy of the hearing examiner's initial decision. Once we explained to the hearing examiner what the whistleblower Protection Act actually protected, she agreed that Johnson's removal was appropriate in this case. I'm sorry, third point, and I hate to do this, but I just want to, last point, counsel's concession today at the podium regarding the availability of clearly established law is reminiscent of the concession at the podium in Vasquez, which in this court's words, killed the claim that there was no qualified immunity. And on that, I will ask that the court reverse. Thank you. Case is submitted.
judges: Pillard; Walker; Edwards